**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|                                        |   |                          |
|----------------------------------------|---|--------------------------|
| UNITED STATES OF AMERICA,              | * |                          |
|     Plaintiff,     | * |                          |
| v.                                     | * | Case No.: PWG-16-1997    |
| PETER HOROWITZ, *et al.*,              | * |                          |
|     Defendants.    | * |                          |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

United States citizens Peter Horowitz and Susan Horowitz lived in Saudi Arabia for most years between 1984 and 2001. Beginning in 1988, they maintained a Swiss bank account at the Union Bank of Switzerland ("UBS"), with money that Peter earned working as an anesthesiologist in Saudi Arabia. When they returned to the United States they did not close their Swiss bank account; by 2008, its balance was almost $2 million. Toward the end of 2008, Peter transferred the money to another Swiss bank account, at Finter Bank ("Finter"), this time in his name only. Yet, Peter, who communicated for the couple with their accountant, never mentioned the accounts, and they signed their tax returns each year without ever answering "Yes" to the income tax return question about whether they had money in an overseas account or filing a file Form TD F 90–22.1 ("FBAR") to disclose either account. In 2010, they disclosed the funds for the first time, and in June 2014, the Government assessed penalties of $247,030 against each of them for their alleged willful failure to disclose the UBS account for the 2007 tax year and penalties of $247,030 against each of them for their alleged willful failure to disclose the Finter account for the 2008 tax year.

The Government has brought this action to collect those penalties, and it moves for summary judgment on its claims. ECF No. 66.[1] The Horowitzes have filed a cross-motion for summary judgment, ECF No. 68, arguing that the IRS reversed the 2014 penalties, such that the penalties the Government is trying to collect were not assessed until 2016, at which time they were untimely. They also argue that their failure to disclose was not willful—a point that would reduce the maximum penalties from 50% of the amount in the foreign account at the time of the violation to $10,000. Because the Horowitzes have not shown that the IRS actually reversed the penalties in 2014, they have not established that the statute of limitations ran before the penalties were assessed. Further, the undisputed facts show that their failure to disclose the UBS account on their 2007 tax return was willful, and that Peter's failure to disclose the Finter account on their 2008 tax return also was willful. Therefore, the Government's motion will be granted and Defendants' denied with regard to the penalties for 2007 and those assessed against Peter for 2008.

But, as noted, in October 2008, Peter transferred the funds out of their joint Swiss bank account into a Swiss bank account in his name only at Finter Bank. Despite the undisputed

---

[1] The parties have filed cross-motions for summary judgment, ECF Nos. 66 and 68. The completed briefing, as amended, appears on the docket as follows: the Government's Amended Memorandum in Support of its Motion for Summary Judgment, ECF Nos 82; Defendants' Amended Memorandum in Support of their Opposition and Cross-Motion for Summary Judgment, ECF No. 86; the Government's Amended Reply and Opposition, ECF No. 83; and Defendants' Amended Reply, ECF No. 85. Additionally, Susan Horowitz filed a Motion for Partial Summary Judgment, ECF No. 67. The completed briefing for that motion, as amended, appears on the docket as follows: Susan's Amended Memorandum, ECF No. 79; the Government's Amended Opposition to Susan's Motion, ECF No. 84; and Susan's Amended Reply, ECF No. 80.

The parties filed a Joint Stipulation of Facts, ECF No. 76, as well as Joint Exhibits, ECF No. 87. They also briefed a dispute regarding the authenticity of some of the exhibits; the briefing appears at ECF Nos. 88, 90, and 91. Given that I did to rely on these exhibits in ruling on the pending motions, their dispute is moot.

A hearing is not necessary with regard to the pending motions. *See* Loc. R. 105.6.

evidence that the parties intended for Susan to be a holder on that account as well, and that they added her to the account in 2009, Susan was not an account holder on the Finter account in 2008. Nor has the Government shown that she had any financial interest in or authority over the Finter account in 2008. Therefore, she had no obligation to disclose the Finter account, and FBAR penalties against her for 2008 are not appropriate.[2] Accordingly, Susan's individual motion for partial summary judgment on this claim regarding 2008 penalties is granted, and the Government's motion with regard to 2008 penalties against Susan will be denied.

## **FBAR Penalties**

Individuals who pay taxes to the United States must "report annually to the Internal Revenue Service ('IRS') any financial interests they have in any bank, securities, or other financial accounts in a foreign country." *United States v. Williams*, 489 Fed. App'x 655, 656 (4th Cir. 2012) (citing 31 U.S.C. § 5314(a)). To do so, a taxpayer must file "a completed form TD F 90–22.1 ('FBAR') with the Department of the Treasury . . . .  on or before June 30 of each calendar year with respect to foreign financial accounts maintained during the previous calendar year." *Id.* (citing 31 U.S.C. § 5314; 31 C.F.R. §§ 1010.350, 1010.306(c)).  If a taxpayer fails to file a timely FBAR, "the Secretary of the Treasury may impose a civil money penalty."  *Id.* (citing 31 U.S.C. § 5321(a)(5)(A)).

When a violation is not "willful," the amount of civil penalty is capped at $10,000. 31 U.S.C. § 5321(a)(5)(B)(i).  In contrast, "[i]n the case of any person willfully violating, or willfully causing any violation of, any provision of section 5314, . . . the maximum penalty [of $10,000 for

---

[2] Although the Horowitzes still had the UBS account for most of 2008, the IRS did not assess penalties against them for failing to disclose that account for tax year 2008; the penalties for 2008 were specifically for failure to disclose the Finter account.  ECF Nos. 87-31 (2008 Penalty Assessment Cert., Peter), 87-33 (2008 Penalty Assessment Cert., Susan).

a non-willful violation] shall be increased to the *greater* of—(I) $100,000, or (II) 50 percent of the [balance in the account at the time of the violation].” 31 U.S.C. § 5321(a)(5)(C)(i); *see United States v. Shinday*, No. 18-CV-6891-CAS-EX, 2018 WL 6330424, at *3 (C.D. Cal. Dec. 3, 2018) (quoting 31 U.S.C. § 5321(a)(5)(C) and noting that Congress removed the original $100,000 cap on penalties for willful violations when it amended the statute in 2004).

The Horowitzes do not dispute the statutory provision. Defs.’ Am. Reply 14. Nonetheless, they argue that “the Department of the Treasury, via notice and comment rulemaking promulgated regulations, limited the maximum amount of willful FBAR penalties to $100,000.” *Id.* (citing 31 C.F.R. § 103.27). And, relying on *United States v. Colliot*, 2018 WL 2271381, at *3 (W.D. Texas 2018), they insist that “the IRS cannot act outside of its own regulation.” *Id.* at 15.

It is true that 31 C.F.R. § 103.27, which is now 31 C.F.R. § 1010.820(g)(2), provides that “[f]or any willful violation committed after October 27, 1986 . . . the Secretary may assess upon any person, a civil penalty[] . . . not to exceed the greater of the amount (not to exceed $100,000) equal to the balance in the account at the time of the violation, or $25,000.” 31 C.F.R. § 1010.820(g)(2) (reorganized and renumbered, with technical corrections, eff. Mar. 1, 2011). But, as the Court of Federal Claims recently explained:

> On October 22, 2004, Congress enacted a new statute that increased the statutory maximum penalty for a “willful” violation to “the greater of [ ] $100,000, or [ ] 50 percent of the ... balance in the account at the time of the violation.” *See* American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418, 1586, § 821 (Oct. 22, 2004) (“Jobs Creation Act”). And, on July 1, 2008, the IRS issued I.R.M. § 4.26.16.4.5.1, that stated: “At the time of this writing, the regulations at [31 C.F.R. § 1010.820] have not been revised to reflect the change in the willfulness penalty ceiling.” I.R.M. § 4.26.16.4.5.1. The IRS, however, warned that, “the statute [*i.e.*, the Jobs Creation Act] is self-executing and the new penalty ceilings apply.” I.R.M. § 4.26.16.4.5.1. Although, the Jobs Creation Act is inconsistent with 31 C.F.R. § 1010.820(g)(2), it is settled law that an agency’s regulations “must be consistent with the statute under which they are promulgated.” *United States v. Larionoff*, 431 U.S. 864, 873, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977). Since the civil penalty amount for a “willful” violation in 31 U.S.C. § 5321(a)(5) (2003) was

replaced with 31 U.S.C. § 5321(a)(5)(C)(i) (2004), the April 8, 1987 regulations are "no longer valid." *Norman*, 138 Fed.Cl. at 196.

*Kimble v. United States*, No. 17-421, 2018 WL 6816546, at *15 (Fed. Cl. Dec. 27, 2018) (emendations in original). The *Kimble* Court persuasively rejected the *Colliot* Court's conclusion that "the IRS is still bound by the maximum penalty in the pre-2004 statute," reasoning that the conclusion "conflicts with the decision of the United State Court of Appeals for the Federal Circuit in *Barseback Kraft AB v. United States*, 121 F.3d 1475 (Fed. Cir. 1997), where the Federal Circuit concluded that the fact that regulations "had not been formally withdrawn from the Code of Federal Regulations [did] not save them from invalidity" based on a conflicting federal statute. *Id.* (quoting *Barseback*, 121 F.3d at 1480). On that basis, the *Kimble* Court affirmed a civil penalty of $697,229, representing 50% of the relevant account balance.

Moreover, the IRS's Internal Revenue Manual ("I.R.M.") § 4.26.16.6.5(3) now provides that "[f]or violations occurring after October 22, 2004, the statutory ceiling is the greater of $100,000 or 50% of the balance in the account at the time of the violation." I.R.M. § 4.26.16.6.5(3) (Nov. 6, 2015).

> The purpose of the IRS Manual is to govern the internal affairs of the Internal Revenue Service. *See United States v. Horne,* 714 F.2d 206, 207 (1st Cir.1983). The provisions of the manual do not have the force of law and are not mandatory or binding for the IRS. *See id. See also Anderson v. United States,* 44 F.3d 795, 799 (9th Cir.1995). Despite these weaknesses, the manual has been used, on a limited basis, to provide guidance in interpreting terms in regulations. *See United States v. Boyle,* 469 U.S. 241, 243 n. 1, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985) (citing IRM section 4350(24) for what constitutes reasonable cause for filing a late tax return). Thus, it is possible for sections of the IRS manual to bear a limited relevance to actions such as the one at hand.

*Vons Cos. v. United States*, 51 Fed. Cl. 1, 13 n.12 (2001), *modified,* No. 00-234T, 2001 WL 1555306 (Fed. Cl. Nov. 30, 2001), *and abrogation on other grounds recognized by Alpha 1, L.P. ex rel. Sands v. United States,* 83 Fed. Cl. 279, 288 (2008). I agree with the *Kimble* Court that 31

C.F.R. § 1010.820(g)(2) cannot be enforced in light of its conflict with 31 U.S.C. § 5321(a)(5)(C)(1) and this more recent provision from the IRS's Internal Revenue Manual. *See Kimble*, 2018 WL 6816546, at *15; I.R.M. § 4.26.16.6.5(3).

"The authority to enforce such assessments has been delegated to the IRS." *Williams*, 489 Fed. App'x at 656 (citing 31 C.F.R. § 1010.810(g)). The statute of limitations for assessing civil penalties for FBAR violations of 31 U.S.C. § 5314 is six years, and it begins to run on the date that the FBAR is due. 31 U.S.C. § 5321(b)(1); *see United States v. Bussell*, No. CV1502034SJOVBKX, 2015 WL 9957826, at *6 (C.D. Cal. Dec. 8, 2015) ("The Secretary of the Treasury may assess a civil penalty for willfully failing to timely report financial interests in foreign accounts "at any time before the end of the 6–year period beginning on the date of the transaction with respect to which the penalty is assessed.").

## Background

Defendants Peter Horowitz, M.D. and Susan Horowitz, Ph.D. are U.S. citizens who have been married since 1969. Jt. Stip. of Facts 1. They lived and worked in Saudi Arabia from 1984 to 1992 and 1994 to 2001. *Id.* ¶¶ 4, 9, 10. Susan, who only worked part of the time they resided in Saudi Arabia, was paid in cash, which she spent on family living expenses. *Id.* ¶¶ 10, 13, 14. From 1984 to 1988, Peter "deposited most of his salary into a Saudi Arabian account at Al-Rajhi Bank, which had a branch at the King Feisal Hospital where he worked." *Id.* ¶ 12.

Using funds from his Al-Rajhi Bank account, Peter established an account at the Swiss bank Foreign Commerce Bank ("FOCO") in 1988. *Id.* ¶ 16. When the Horowitzes returned to the United States in 1992, "Peter withdrew the remaining balance in his account at Al-Rajhi Bank." *Id.* ¶ 18.

In 1994, the Horowitzes returned to Saudi Arabia, and Peter closed the FOCO bank account and opened an account at the Union Bank of Switzerland ("UBS"), "using funds transferred from his FOCO account." *Id.* ¶¶ 19, 21, 22. Peter and Susan jointly owned the UBS account, and the "account opening documents listed an address for Peter and Susan [in] Saudi Arabia." *Id.* ¶¶ 23, 27. Peter used his account at the Al-Rajhi Bank again beginning in 1997 and transferred his savings to the UBS account. *Id.* ¶ 25.

When the Horowitzes left Saudi Arabia for the United States in 2001, Peter again withdrew the funds that remained in his Saudi Arabian bank account. *Id.* ¶ 26. The Horowitzes left the UBS account open. *Id.* ¶ 26.

From 2001 to 2008, Peter monitored the UBS account "by calling the bank every year or two," and neither of the Horowitzes made any deposits into or withdrawals from the account. *Id.* ¶¶ 28–29. After "read[ing] troubling news articles concerning UBS," Peter called UBS and then traveled to Switzerland in October 2008 and closed the account. *Id.* ¶¶ 30, 32, 34–35.

Peter transferred the account balance to an account that he opened at another Swiss bank, Finter Bank ("Finter"). *Id.* ¶ 36. Peter had brought Susan's passport with him "to designate her as a joint account owner of the Finter account at the time that he opened that account," but Finter would not allow him to do so because Susan was not present. *Id.* ¶ 37. When Peter opened the account, he filled out a "List of Authorized Signatories and Powers of Attorney for Natural Persons," designating Susan as a person to whom he gave "an unlimited power of attorney." Finter Bank Docs., ECF No. 87-8, at 1–2. Because she was not present, Susan could not sign the "signature specimen" box on the form. *See id.*

According to the Government,

The UBS account was a "hold mail" account in which the bank agreed to hold statements at the bank for pickup or inspection by the account holders rather than mailing them to account holders on a periodic basis. "BLST Zurich" is the only information that appeared in the address field of the Defendants' UBS bank account statements. UBS typically charged a fee for this "hold mail" service.

Compl. ¶ 13, ECF No. 1. Peter Horowitz neither admitted nor denied this allegation. P. Horowitz Ans. ¶ 13, ECF No. 17. Peter did, however, admit in his Answer that "*Finter* Bank designated the account as a numbered account and a hold mail account." *Id.* ¶ 21 (emphasis added). Yet, Peter testified on November 9, 2017 that when he identified the UBS account as a hold mail account on an IRS Offshore Voluntary Disclosure Program form, he did so incorrectly, as it was not. P. Horowitz Dep. 127:19 – 129:16, 131:12–19; *see also* Forms, ECF No. 87-1.

The Horowitzes did not make any additional deposits after opening the Finter account. Jt. Stip. of Facts ¶ 40. In October 2009, they traveled to Switzerland and added Susan "as a joint owner of record of the Finter account." *Id.* ¶ 41.

Accountant Jack Weiss began preparing Peter's personal tax returns beginning in about the late 1970's and continuing through the time the Horowitzes lived in Saudi Arabia, during which time he prepared their joint income tax return. *Id.* ¶¶ 42–45. Weiss would prepare the tax returns and mail them to the Horowitzes for signature, and the Horowitzes would sign them and submit them to the IRS. *Id.* ¶¶ 46–47. Accountant Ivan Sokoloff began preparing the Horowitzes tax returns sometime after they returned from Saudi Arabia, and he prepared their 2007 and 2008 joint tax returns, which Donald Hilker, a partner at the firm where Sokoloff worked, "reviewed and signed as the 'paid preparer.'" *Id.* ¶¶ 51, 53, 54. The Horowitzes' tax returns, "including those for 2007 and 2008, were prepared relying on summaries of tax-pertinent information that Peter prepared and mailed to the return preparer each year"; those "summaries never listed the UBS or Finter account." *Id.* ¶¶ 48, 49. Additionally, Peter, who communicated with the accountants on

behalf of himself and his wife, *id.* ¶ 49, never asked whether he should disclose either account. P. Horowitz Dep. 168:6–9, ECF No. 87-1.

The 2007 tax return included "Part III: Foreign Accounts and Trusts," which stated:

You must complete this part if you (a) had over $1,500 of taxable interest or ordinary dividends; or (b) had a foreign account; or (c) received a distribution from, or were a grantor of, or a transferor to, a foreign trust.

7a At any time during 2007, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See page B-2 for exceptions and filing requirements for Form TD F 90-22.1 [FBAR].

  b If "Yes," enter the name of the foreign country.

8 During 2007, did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust?

  If "Yes," you may have to file Form 3520. See page B-2.

Form 1040, Sched. B, ECF No. 87-16, at 8. The 2008 tax return included the same questions. *See* Form 1040, Sched. B ECF No. 87-17, at 7. On the 2007 and 2008 tax returns, the Horowitzes' accountant, on their behalf, typed an "X" in the box for "No" next to questions 7a and 8; the line next to 7b was blank. Form 1040, Sched. B, ECF No. 87-16, at 8; Form 1040, Sched. B ECF No. 87-17, at 7. "The Horowitzes did not timely file FBARs for either 2007 or 2008." *Id.* ¶ 55. In 2009, however, they did timely file an FBAR, "disclosing their interest in the Finter Account." *Id.* ¶ 56.

The Horowitzes identified the FOCO, UBS, and Finter accounts to the IRS in January 2010 and "requested they be accepted into the Department of the Treasury's 'Offshore Voluntary Disclosure Program'" (the "Program"), which they were that same month. *Id.* ¶¶ 59–60.[3] As required by the Program, the Horowitzes "filed an FBAR for each year 2003 through 2008 and

---

[3] Curiously, in their Answers, the Horowitzes had denied that he participated in the program or even was aware of the program. P. Horowitz Ans. ¶ 25; S. Horowitz Ans. ¶ 25.

amended Form 1040 income tax returns for 2003 through 2008." *Id.* ¶ 61.  They opted out of the Program in December 2012. *Id.* ¶ 62.

On May 19, 2014, the IRS sent a "Letter 937" to each of the Horowitzes.  ECF No. 87-27, at 1, 2 (Peter); ECF No. 87-28, at 1, 2 (Susan).  The letter stated that the IRS had "enclosed an examination report showing proposed FBAR penalty for [2007 and 2008]" and directed the Horowitzes to review the report and inform the IRS whether they agreed (in which case they could sign an enclosed form and send in the "requested" payment by check) or disagreed.  *Id*. at 2.  If they disagreed, they could sign a Consent to Extend the Time to Assess Civil Penalties provided by 31 U.S.C. § 5321 for FBAR Violations ("Consent to Extend the Time") "to provide additional time to discuss the adjustments." *Id.*  The letter provided that if the Horowitzes did neither by June 2, 2014, the IRS would "process [their] case based on the information shown in the report."  *Id.* The Horowitzes each already had filed a Consent to Extend the Time on May 3, 2014, which the IRS signed on June 4, 2014.  ECF Nos. 87-61 (Peter), 87-62 (Susan).

On June 13, 2014, the IRS assessed two $247,030 FBAR penalties against Peter Horowitz: one "for his willful failure to report an account at UBS in 2007," and one "for his willful failure to report an account at Finter bank in 2008"; it assessed identical dollar amounts as penalties against Susan Horowitz. Jt. Stmt. of Facts ¶¶ 63–64; *see* Form 13448 Penalty Assessment Certification (Title 31 "FBAR"), ECF Nos. 87-30 (Peter, 2007), 87-31 (Peter, 2008), 87-32 (Susan, 2007), 87-33 (Susan, 2008).  It was Nancy Beasley, FBAR Penalty Coordinator, who input the information into a database to assess the penalties; the database generated forms that stated the penalties. Beasley Tr. 6:13–7:5, ECF No. 87-38.  She printed the four forms for her manager, William Calamas, CTR Operations Manager, to sign, which he did the same day, thereby "verif[ying] that the assessment[s] [were] made."   Beasley Tr. 7:5–19; Form 13448 Penalty Assessment

Certifications. On the same date, the IRS sent the Horowitzes Letter 3708 "to demand payment" of the FBAR penalties. ECF Nos. 87-34 (Peter), 87-35 (Susan). The letter stated that they "may still request a hearing in [the IRS] Appeals Office," by submitting the "request[] in writing, within 30 days from the date of th[e] letter, by following the requirements provided in Letter 3709." *Id.*

On June 23, 2014, Peter filed an "FBAR Protest," appealing the proposed FBAR penalties to "IRS Appeals." ECF No. 87-24, at 1. The FBAR Protest stated that "[t]he date for filing this protest was extended to July 24, 2014 by agreement." *Id.* The record does not include an FBAR Protest signed by Susan, but the parties agree that "[a]fter the IRS examination, Peter and Susan Horowitz protested their respective willful FBAR penalties to the IRS Office of Appeals." Jt. Stip of Facts ¶ 67. Their appeal was assigned to IRS Appeals International Specialist Grayse Rodrigo, Jt. Stip. of Facts ¶¶ 67, 71, who noticed that the Horowitzes had filed Consents to Extend the Time, extending the statute of limitations for assessing these penalties to December 31, 2015, Emails, ECF No. 87-37; *see* Jt. Stmt. of Facts ¶¶ 65–66. The Horowitzes acknowledge that "the FBAR penalties had already been assessed against Peter Horowitz and Susan Horowitz," but assert that "Ms. Rodrigo determined that the case *should have been* in an unassessed posture for purposes of IRS Appeals review." Defs.' Am. Mem. 17 (citing Emails, ECF No. 87-37) (emphasis added). On October 16, 2014, Rodrigo asked her manager, Jennifer Sawyer, and IRS Appeals FBAR Coordinator Daisy Batman to reverse the 2007 and 2008 penalty assessments. Defs.' Am. Mem. 17 (citing Emails, ECF No. 87-37). Batman in turn emailed Beasley on October 17, 2014, "requesting that Ms. Beasley 'remove/reverse' the willful FBAR penalties" as "prematurely" assessed. *Id.* at 17–18 (citing Emails, ECF No. 87-37). Beasley informed Batman in an October 24, 2014 email that she had "removed the penalty input date on the penalties." Emails, ECF No. 87-37.

According to Beasley's April 26, 2017 testimony, she reversed the FBAR penalties when she removed the penalty date. Beasley Tr. 28:2–9, ECF No. 87-38. But, previously, in a January 24, 2017 Declaration, Beasley had stated that removing the penalty input date "did not effect a reversal or removal of the June 13, 2014 assessment." Beasley Decl. ¶ 11, ECF No. 87-54. And, on May 20, 2016, in response to a request from Batman that she "confirm[] that the assessed FBAR penalty was never reversed for both Peter and Susan Horowitz," Beasley had written:

> You are correct. I did remove the date Penalty was input but did not clear the information. I was awaiting determination, now you have given it and it remains the same. I will input the original penalty input date and proceed with the referral to DOJ.

Emails, ECF No. 87-37.

The Government brought this action "to collect the penalties assessed against Peter and Susan Horowitz under 31 U.S.C. § 5321(a)(5) for their failure to report an interest in a foreign bank account for the calendar years 2007 and 2008." Compl. 1, ECF No. 1. It claims that the Horowitzes had to report the UBS and Finter accounts because their balances exceeded $10,000, but the Horowitzes failed to file timely FBARs for 2007 and 2008, in violation of 31 U.S.C. § 5314. *Id.* ¶¶ 27–28. Additionally, it claims that they did so willfully. *Id.* ¶ 31.

## Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there

is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). Where, as here, the parties present the Court with cross-motions for summary judgment, the Court must consider the facts relevant to each motion in the light most favorable to the nonmovant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

## Discussion

### *Statute of Limitations*

The parties agree that the IRS timely assessed the FBAR penalties on June 13, 2014, and the statute of limitations for assessing FBAR penalties ran on December 31, 2015. Jt. Stip. of Facts ¶¶ 63–66; Defs.' Am. Mem. 14–16, 17 ("[T]he FBAR penalties had already been assessed against Peter Horowitz and Susan Horowitz" on June 13, 2014.). Nonetheless, Defendants argue that they are entitled to summary judgment on all claims because the statute of limitations for assessing FBAR penalties had run before the Government assessed penalties against them. Defs.' Am. Mem. 14. Specifically, they contend that the penalties assessed on June 13, 2014, *id.* at 16, were reversed on October 24, 2014, *id.* at 18–19, 22, and not "reassess[ed]" until May 20, 2016, *id.* at 22, long after the December 31, 2015 statute of limitations for assessing the penalties had run, *id.* at 14. Thus, the question is whether they could have been (and were) reversed.

The Government concedes that "around October 24, 2014, Ms. Beasley 'removed the penalty input dates' from the 'modules' in her database (to use Defendants' term) corresponding to the penalty assessments against the Defendants," as well as that "she certainly took this action in response to Ms. Batman's request (transmitted on behalf of Grayse Rodrigo) that she

'remove/reverse the assessed penalties." Gov't Am. Reply & Opp'n 22. But, it does not agree that these actions amounted to an actual removal of the penalties themselves. *Id.* at 21–23.

Significantly, Beasley's statements in this regard conflict, as she first declared that she did not reverse the June 2014 assessments and then testified that she did. *Compare* May 20, 2016 Email from Beasley, ECF No. 87-37, at 1 (stating that Batman was "correct" that "the assessed FBAR penalty was never reversed for both Peter and Susan Horowitz," as all Beasley did was "remove the date Penalty was input" without "clear[ing] the information"), *and* Jan. 24, 2017 Beasley Decl. ¶¶ 9–11 ("I was asked to 'remove' or 'reverse' the June 13, 2014 assessment . . . . In response to that request, I merely cleared the information in the 'Date Penalty Input' field within the database which is used to track FBAR assessments. . . . [M]y actions did not effect a reversal or removal of the June 13, 2014 assessment."), *with* Apr. 26, 2017 Beasley Tr. 28:2–9 ("Q . . . [Y]ou said you removed the penalty input date. Does that mean, when you said you followed her instruction, her instruction was remove and reverse the assessed penalties for '07 and '08. Did you remove and reverse the assessed penalties for '07 and '08? A Yes."). Thus, Defendants have not demonstrated through evidence of *undisputed* facts that Beasley reversed the assessment, such that the timely assessment was vacated and the statute of limitations for assessing penalties had run by the time the IRS assessed FBAR penalties in May 2016.

Moreover, "[t]he statute of limitations is an affirmative defense for which the defendant bears the burden of proof." *Windsor v. Bd. of Educ. of Prince George's Cty.*, No. TDC-14-2287, 2016 WL 4939294, at *9 (D. Md. Sept. 13, 2016) (citing *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007)). Defendants have not shown that, even if Beasley believed she reversed the penalty, she had the authority to do so. Notably, to assess the penalties in the first place, Beasley not only input the data; she then printed a form that her manager signed. Beasley Tr. 7:11–19;

Form 13448 Penalty Assessment Certifications.  For Beasley to be able to reverse or remove an FBAR penalty assessment without her manager's signature would be incongruous with his initial signature required to impose  the penalty in the first instance.

And, as the Government notes, Gov't Am. Mem. 33, an agency must have Department of Justice approval to "compromise a claim of the Government" that exceeds $100,000.  31 U.S.C. § 3711(a)(2) ("The head of an executive, judicial, or legislative agency-- **. . .** may compromise a claim of the Government of not more than $100,000 (excluding interest) or such higher amount as the Attorney General may from time to time prescribe that has not been referred to another executive or legislative agency for further collection action . . . ."); 31 C.F.R. § 902.1(b) ("Unless otherwise provided by law, when the principal balance of a debt, exclusive of interest, penalties, and administrative costs, exceeds $100,000 or any higher amount authorized by the Attorney General, the authority to accept the compromise rests with the Department of Justice. The agency should evaluate the compromise offer, using the factors set forth in this part. If an offer to compromise any debt in excess of $100,000 is acceptable to the agency, the agency shall refer the debt to the Civil Division or other appropriate litigating division in the Department of Justice using a Claims Collection Litigation Report (CCLR). Agencies may obtain the CCLR from the Department of Justice's National Central Intake Facility. The referral shall include appropriate financial information and a recommendation for the acceptance of the compromise offer. Justice Department approval is not required if the agency rejects a compromise offer.").

The Government also notes that the FBAR Penalties section of the I.R.M. "advises IRS employees: 'Post-assessed FBAR cases in excess of $100,000 cannot be compromised by Appeals without approval of Department of Justice (DOJ). *See* 31 U.S.C. § 3711(a)(2) and 31 C.F.R. § 902.1(a) and (b).  Once assessed the penalty becomes a claim of the U.S. government."  Gov't

Am. Mem. 33 (quoting I.R.M. § 8.11.6.1.6.).[4] The I.R.M., which "can provide guidance," *see Vons Cos. v. United States*, 51 Fed. Cl. 1, 13 n.12 (2001), suggests that, once assessed, an FBAR penalty exceeding $100,000, such as the Horowitzes' penalties, cannot be compromised without DOJ approval. *See* I.R.M. § 8.11.6.1.6.

Certainly, Defendants argue that removal or reversal does not fit the definition of compromise, and that may be semantically true. But, Defendants have not established that, when the IRS could not "compromise" an FBAR penalty above $100,000 at all without DOJ approval, it nonetheless could eliminate the debt altogether by removing the FBAR penalties after they undisputedly were assessed. Therefore, Defendants have not proven that the timely FBAR assessments were reversed or removed when Beasley altered the data, nor have they established that she had the authority to reverse an assessment. Consequently, they have not met their burden of proving that the statute of limitations ran before the FBAR penalties were assessed. *See Goodman,* 494 F.3d at 464; *Windsor*, 2016 WL 4939294, at *9. Insofar as the Horowitzes rely on the statute of limitations, their Cross-Motion for Summary Judgment is denied.

### *Liability for Failure to File FBAR*

The Government seeks to collect on FBAR penalties that the IRS assessed and the Horowitzes have refused to pay. It filed suit pursuant to 31 U.S.C. § 5321(b)(1), which "permits the Secretary of Treasury to 'commence a civil action to recover a civil penalty assessed under subsection (a) . . . .'" *United States v. Williams*, No. 09-CV-437, 2010 WL 3473311, at *1 (E.D.

---

[4] I.R.M. § 8.11.6, FBAR Penalties, was updated September 27, 2018 and no longer includes I.R.M. § 8.11.6.1.6. *See* I.R.M. § 8.11.6, *available at* https://www.irs.gov/irm/part8/irm_08-011-006. But, the Horowitzes do not dispute that this subpart applied in June and October, 2014, focusing instead on the language of the statute and its meaning, *see* Defs.' Reply 12–14.

Va. Sept. 1, 2010) ("*Williams I*"), *rev'd on other grounds,* 489 Fed. App'x 655 (4th Cir. 2012) ("*Williams II*"). In *Williams I*, the District Court for the Eastern District of Virginia observed that "the statute does not indicate the legal standard to be applied by courts in such an action," and that, to the Virginia court's knowledge, "no other court . . . has addressed this issue." *Id.* The Government relies on the Virginia court's conclusion that "a *de novo* standard is appropriate," *id.*; *see* Gov't Am. Mem. 12, and Defendants do not address the issue. Thus, to prevail on its claims, the Government must show that the undisputed facts demonstrate that the Horowitzes were required, but willfully failed, to file FBARs for 2007 and 2008.

The undisputed evidence establishes that the Horowitzes had a foreign bank account with a balance in excess of $10,000 in 2007 but did not file an FBAR for 2007 by the June 2008 due date. Jt. Stip. of Facts ¶ 55; Defs.' Am. Mem. 25 ("[T]hey failed to file FBAR forms for the 2007 and 2008 years."); 2007 Jt. Tax Return, ECF No. 87-16; 2008 Jt. Tax Return, ECF No. 87-16; Dec. 31, 2007 UBS Account Stmt., ECF No. 87-5. It also shows that they maintained the account without withdrawing any funds until October 2008, at which time Peter withdrew all of the money and deposited it into another foreign bank account, which he opened in his name only. Jt. Stip. of Facts ¶¶ 28–29, 35–36. Still, neither of them filed an FBAR for 2008 by the June 2009 due date. Jt. Stip. of Facts ¶ 55; Defs.' Am. Mem. 25; *see* Dec. 31, 2008 Finter Account Stmt., ECF No. 87-7. The IRS assessed penalties against both Horowitzes for willful failure to disclose the UBS bank account by June 2008 and the Finter bank account by June 2009. Thus, with regard to Peter's failure to file either a 2007 or 2008 FBAR and Susan's failure to file a 2007 FBAR, the issue is simply whether the failure was willful. As for Susan's failure to file a FBAR for 2008 disclosing the Finter account, there is the added issue of whether she was required to make that disclosure. I will address that preliminary issue first.

<u>Susan Horowitz and the Finter Account in 2008</u>

The Government seeks to collect a $247,030 penalty, plus interest, from Susan for her failure to disclose the Finter account for 2008. Compl. ¶¶ 34, 39. Susan moves for partial summary judgment, arguing that she was not obligated to disclose that account in 2008. Susan's Am. Mem.

1. The Treasury Regulations provide:

> Each United States person having *a financial interest in, or signature or other authority over*, a bank . . . account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a [FBAR] reporting form . . . .

31 C.F.R. § 1010.350 (emphasis added); *see also* Gov't Am. Opp'n to Susan's Mot. 2 (citing 31 C.F.R. § 103.24, which included the same language and was "relocated to 31[] C.F.R. § 1010.350" in 2011); Defs.' Am. Reply 10 (citing 31 C.F.R. § 103.24); 31 C.F.R. § 1010.306 ("Reports required to be filed by § 1010.350 shall be filed with FinCEN [Financial Crimes Enforcement Network] on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year."). Thus, the question is whether Susan had a financial interest in or any authority over the Finter account in 2008.

It is undisputed that, when Peter Horowitz traveled to Switzerland and opened the Finter account on October 13, 2008, he and Susan intended to own the account jointly. Jt. Stip. of Facts ¶ 37. But Susan had not traveled to Switzerland with him, and Finter would not make her an account holder without her present, so Peter alone signed the opening documents, as the sole account holder. *Id.*; Finter Docs., ECF No. 87-63. It also is undisputed that Susan later became an account holder, but not until 2009. Jt. Stip. of Facts ¶ 41. Additionally, it is undisputed that, when Peter opened the account, he filled out a "List of Authorized Signatories and Powers of Attorney for Natural Persons," designating Susan as a person to whom he gave "an unlimited

power of attorney." Finter Bank Docs., ECF No. 87-8, at 1–2. Because she was not present, Susan could not sign the "signature specimen" box on the form. *See id.* The Government concedes that she could not exercise her power of attorney until she signed the form. *See* Gov't Am. Opp'n to Susan's Mot. 6 ("Based on the POA form Peter filled out, Susan could exercise signatory status *once she provided a signature specimen to Finter*.").

In the Government's view, Susan had a financial interest in and authority over the account, based on the Horowitzes' intent to include her as an account owner and Peter's designation of Susan as a power of attorney. Gov't Am. Opp'n to Susan's Mot. 5, 6. Susan counters that, despite their intent, she simply was not an owner of the Finter account in 2008 and, because she had not provided a "signature specimen" on the power of attorney form, she did not have any authority over the account. Susan's Am. Reply 13.

The Government relies on the 2011 definitions of "financial interest" and "other authority" that the Treasury Regulations provide. *See* Gov't Am. Opp'n to Susan's Mot. 5, 6 (quoting 31 C.F.R. § 1010.350(e)(2)(i), (f)). The definition of "financial interest" states:

> A United States person has a financial interest in each bank . . . account in a foreign country for which the owner of record or holder of legal title is—
> (i) A person acting as an agent, nominee, attorney or in some other capacity on behalf of the United States person with respect to the account[.]

31 C.F.R. § 1010.350(e)(2)(i). Susan notes that "[t]hose regulations were promulgated in 2011," and she relies instead on the 2008 FBAR definition: "A United States person has a financial interest in … [a] financial account in a foreign country for which the owner of record or holder of legal title is … a person acting as an agent, nominee, attorney, or in some other capacity on behalf of the U.S. person." Defs.' Am. Reply 10 (citing Instructions for Form TD F 90-22.1 (Rev. 10-2008)). These definitions are effectively the same.

It is true that Peter took the funds in the UBS account, which Susan jointly held, and tried to open the Finter account on behalf of himself and Susan. And, he granted Susan power of attorney for the Finter account. But, when Fitner would not allow him to open the account in both of their names, he proceeded to take their joint funds and place them into an account in his name only, over which Susan could not exercise any control without traveling to Switzerland and providing a signature specimen. Taking money that was in Susan's name and placing it in an account that was not in her name cannot, in any light, be seen as acting on her behalf.

Moreover, the question is whether Peter acted on her behalf "with respect to the account," that is, *after* the Finter account existed. 31 C.F.R. § 1010.350(e)(2)(i). It is undisputed that Peter did not make any additional deposits after opening the account. Jt. Stip. of Facts ¶ 40. And, there is no evidence that Peter did anything with the account before October 2009 when Susan became a joint account owner. Therefore, even if both parties intended for Susan to have a financial interest in the account and she ultimately gained that interest in 2009, she did not have a financial interest in the account in 2008. *See* 31 C.F.R. § 1010.350(e)(2)(i).

Nor did she have any authority over the account. The definition of "signature or other authority" as of 2011 is "the authority of an individual (alone or in conjunction with another) to control the disposition of money, funds or other assets held in a financial account by direct communication (whether in writing or otherwise) to the person with whom the financial account is maintained." 31 C.F.R. § 1010.350(f)(1); *see* Gov't Am. Opp'n to Susan's Mot. 6. Again, Susan notes that "[t]hose regulations were promulgated in 2011," and she relies instead on the 2008 FBAR definition:

> [possessing the authority to] control the disposition of money or other property in
> it by delivery of a document containing his or her signature . . . to the bank . . . with
> whom the account is maintained. Other authority exists in a person who can
> exercise comparable power over an account by communication with the bank or

other person with whom the account is maintained, either directly or through an agent, nominee, attorney or in some other capacity on behalf of the U.S. person, either orally or by some other means.

Defs.' Am. Reply 10 (citing Instructions for Form TD F 90-22.1 (Rev. 10-2008)).

Even applying the definition the Government relies on, Susan did not have authority over the Finter account in 2008. As noted, the Government acknowledges that she "could exercise signatory status *once* she provided a signature specimen to Finter." *See* Gov't Am. Opp'n to Susan's Mot. 6 (emphasis added). Had she done so in 2008, she would have had signatory status and, therefore, authority over the account in 2008. But she did not. Without that signature specimen, she could not write to, or otherwise directly communicate with, the bank "to control the disposition of money, funds or other assets" in the Finter account. *See* 31 C.F.R. § 1010.350(f)(1). Accordingly, she did not have authority over the Finter account in 2008. *See id.*

The Government argues in a footnote that "[i]f the Court finds that Susan Horowitz was not required to report the Finter account during 2008, then she nevertheless committed a 2008 violation by failing to report her interest in the UBS account, which she co-owned until October 2008." Gov't Am. Opp'n to Susan's Mot. 6 n.2. The Government contends that Susan should not "now benefit from the maneuver in 2008 to avoid disclosure, by being relieved of the 2008 reporting duty and associated penalty." *Id.* at 7. And they offer evidence (much of which is currently disputed) intended to prove that Peter originally selected the UBS account to avoid paying taxes on the overseas funds and then moved the Horowitzes' money from the UBS account because otherwise the account would have been disclosed and they would have had to pay taxes on it. E.G., News articles, "Ex-UBS Banker Pleads Guilty in Tax Evasion"; "Feds Press Swiss Bank to Name U.S. Clients --- Tax Officials Target An Alleged Dodge; UBS Caught in Blind"; "U.S. Asks Court to Force UBS to Provide Names"; "Judge Clears U.S. Request for UBS Clients'

Names"; "Senate Report Examines Role of Banks in Tax Evasion"; "Senate Report Today Alleges Foreign Banks Help Hide Wealthy Americans' Money"; "UBS says it will drop some offshore services for U.S. clients Change should help IRS keep tabs on evasion"; "Senate Probe's Targets Give to Campaigns Report Accuses Bank Officials of Helping Clients Hide Money From the IRS"; "IRS, Justice Target Undisclosed Assets in Swiss Accounts"; "Notice to UBS Accountholders," dated Nov. 10, 2009, ECF Nos. 87-44 – 87-53.

But, the Government did not charge Susan with an FBAR violation with regard to the *UBS* account, and in this litigation it does not seek to collect penalties assessed for 2008 with regard to the UBS account. Certainly, its desire to pursue penalties on the Finter account for 2008 instead makes sense, since the UBS account no longer had any funds at the time of the 2008 FBAR violation, and therefore the penalty would have been capped at $100,000. *See* 31 U.S.C. § 5321(a)(5)(C)(i) (providing that the maximum penalty for a willful violation is "the *greater* of— (I) $100,000, or (II) 50 percent of the [balance in the account at the time of the violation]"). But, it could have recognized that it would not be able to collect against Susan and instead assessed a greater penalty against Peter for the Finter account. Essentially, it could have assessed approximately the same total penalty for 2008 ($494,060) by assessing a penalty of 50% of the account balance against Peter instead of an approximately 25% penalty against each of the Defendants. This would have been a logical approach, given that before October 2008 and after October 2009, these were joint funds but Susan was not a Finter account owner in 2008. The outcome would have been that the couple, who jointly paid their taxes and maintained joint accounts for years, would, together, have had to pay the same amount of penalty that the Government sought to recover by assessing a $247,030 penalty against Susan for 2008. The

Government did not take this approach, however, and it cannot now collect on a penalty it did not assess.  Susan's Motion for Partial Summary Judgment IS GRANTED.

### The Horowitzes' UBS Account in 2007 and Peter Horowitz's Finter Account in 2007

The Horowitzes testified that, based on conversations with other expatriates living in Saudi Arabia, they believed that, for "income that was earned in Saudi Arabia, taxes were paid on that income from Saudi Arabia" and "if you banked it overseas, . . . you didn't have to pay U.S. taxes on that income."  P. Horowitz Dep. 172:2 – 173:4, ECF No. 87-1; S. Horowitz Dep. 186:16–187:6, ECF No. 87-2 ("[W]e believed that if you earned money overseas, outside of states and you banked it overseas, then that money did not have to be taxed.").  Peter stated that he did not think he needed to file an FBAR for 2007 or 2008. P. Horowitz Dep. 208:10–16. Susan stated that she did not even know what an FBAR was at that time.  S. Horowitz Dep. 237:11–18; *see also id.* at 159:4–20 (stating that she never has participated in filing income tax returns as her "husband handles all of the taxes").  Their tax accountants neither asked about overseas bank accounts nor explained the FBAR or the question about foreign accounts on Form 1040, Schedule B, which they completed on the Horowitzes' behalf. Sokoloff Dep. 71:4–22, 72:3–12, ECF No. 87-67; P. Horowitz Dep. 166:1 – 167:2, 208:21 – 209:3.  They insist that neither of them had actual knowledge of the FBAR requirement and therefore penalties for willful violations are not appropriate.  Defs.' Am. Mem. 23.

The Government counters that, despite the Horowitzes' testimony to the contrary, there is no genuine dispute that they knew about the FBAR requirement.  The Government relies on Schedule B of the Form 1040s that the Horowitzes both signed for 2007 and 2008, which included a simple instruction in Part III: "**You must complete this part if you** (a) had over $1,500 of taxable interest or ordinary dividends; or **(b) had a foreign account** . . . ."  Form 1040, Sched. B, ECF

No. 87-16, at 8 (emphasis added); *see* Form 1040, Sched. B ECF No. 87-17, at 7 (same). Certainly, the Horowitzes had to complete Part III for the unrelated reason that they had more than $1,500 in ordinary dividends. *See* Form 1040, Sched. B, ECF No. 87-16, at 8; Form 1040, Sched. B ECF No. 87-17, at 7. But, the instruction made clear that Part III also applied to taxpayers with foreign accounts, and, unlike the question covered by subsection (a), the response required by subsection (b) regarding foreign accounts in no way turned on whether the Horowitzes believed the foreign account was taxable—merely on whether it existed. Peter and Susan had the UBS account in 2007 and until October, 2008, and Peter had the Finter account beginning in October 2008. Neither can claim that they did not know that Part III had to be filled out with regard to those unmistakably "foreign account[s]."

Schedule B then included a simple question:

7a  At any time during 2007, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See page B-2 for exceptions and filing requirements for Form TD F 90-22.1 [FBAR].

 b  If "Yes," enter the name of the foreign country.

Form 1040, Sched. B, ECF No. 87-16, at 8; *see* Form 1040, Sched. B ECF No. 87-17, at 7 (same, but for 2008). On the 2007 and 2008 tax returns, the Horowitzes' accountant, on their behalf, typed an "X" in the box for "No" next to questions 7a and 8; the line next to 7b was blank. Form 1040, Sched. B, ECF No. 87-16, at 8; Form 1040, Sched. B ECF No. 87-17, at 7. Again, the Horowitzes cannot contend that they did not know that they had an interest in their UBS account until October 2008, and Peter cannot contend that he did not know that he had an interest in the Finter account later in 2008. As the Government sees it, the Horowitzes knew that the answer was "Yes" and that establishes their actual knowledge of, or at least willful blindness to, the FBAR. Gov't Am. Mem. 23–24.

In this regard, *Williams II* is informative.[5]  J. Bryan Williams had violated 31 U.S.C. § 5314 by failing to report his interest in two foreign (Swiss) bank accounts for the year 2000. 489 Fed App'x at 656.  Similar to the Horowitzes, "[o]n his 2000 federal tax return, Williams checked "No" in response to th[e] question [about having interest in a foreign bank account], and he did not file an FBAR by the June 30, 2001, deadline."  *Id*. at 657.  Like the Horowitzes, Williams later disclosed his foreign accounts when he applied to the Offshore Voluntary Compliance Initiative. *Id.* at 657.

The facts diverge in two regards, however.  First, unlike the Horowitz's accountants, Williams's accountant had asked whether he had an interest in a foreign bank account, and Williams had said no. *Id*. at 656. Second, Williams was charged with and pled guilty to conspiracy to defraud and criminal tax evasion, related to his funds held in foreign accounts.  And, in pleading guilty, Williams admitted that he knew that the interest from the funds in his foreign accounts was "taxable income to [him]" and that he

> had the obligation to report to the IRS and/or the Department of the Treasury the
> existence of the Swiss accounts, but for the calendar year tax returns 1993 through
> 2000, [he] chose not to in order to assist in hiding [his] true income from the IRS
> and evade taxes thereon.

*Id*. at 657.

---

[5] The Horowitzes dismiss this case law as not binding.  It is true that—even though Fed. R. App. P. 32.1 permits unpublished opinions to be *cited*—the case is not precedential.  *See Williams II*, 489 Fed. App'x at 655 ("Unpublished opinions are not binding precedent in this circuit."); Fed. R. App. P. 32.1 Advisory Comm. Notes (Rule 32.1 is extremely limited. . . . It says nothing about what effect a court must give to one of its unpublished opinions or to the unpublished opinions of another court.  Rule 32.1. addresses only the *citation* of federal judicial dispositions that have been *designated* as 'unpublished' or 'non-precedential.'").  Nonetheless, its well-reasoned analysis, in the absence of any binding precedent, provides useful guidance.

The IRS assessed civil penalties against Williams, and the Government sought to enforce them through a civil action in the Eastern District of Virginia. *Id.* The district court entered judgment in favor of Williams, and the government appealed. *Id.* The question before both courts was "whether the violation was willful." *Id.* at 658. The district court found that Williams' violation was not willful because he "lacked any motivation to willfully conceal the accounts from authorities," which already knew about the accounts, and because he did not fail to disclose the accounts "intentionally or in deliberate disregard for the law"; the district court reasoned that the failure to disclose was "an understandable omission given the context in which it occurred." *Id.* at 658.

The Fourth Circuit disagreed and reversed. It observed:

> "Willfulness may be proven through inference from conduct meant to conceal or mislead sources of income or other financial information," and it "**can be inferred from a conscious effort to avoid learning about reporting requirements**." *United States v. Sturman,* 951 F.2d 1466, 1476 (6th Cir.1991) (internal citations omitted) (noting willfulness standard in criminal conviction for failure to file an FBAR). Similarly, "willful blindness" may be inferred where "a defendant was subjectively aware of a high probability of the existence of a tax liability, and purposefully avoided learning the facts point to such liability." *United States v. Poole,* 640 F.3d 114, 122 (4th Cir. 2011) (affirming criminal conviction for willful tax fraud where tax preparer "closed his eyes to" large accounting discrepancies). **Importantly, in cases "where willfulness is a statutory condition of civil liability, [courts] have generally taken it to cover not only knowing violations of a standard, but *reckless* ones as well**." *Safeco Ins. Co. of America v. Burr,* 551 U.S. 47, 57, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007) (emphasis added). Whether a person has willfully failed to comply with a tax reporting requirement is a question of fact. *Rykoff v. United States,* 40 F.3d 305, 307 (9th Cir.1994); *accord United States v. Gormley,* 201 F.3d 290, 294 (4th Cir.2000) ("[T]he question of willfulness is essentially a finding of fact.").

*Id.* at 658 (emphases added); *see also Bedrosian v. United States*, No. 15-5853, 2017 WL 1361535, at *4 (E.D. Pa. Apr. 13, 2017) (observing that "only three federal courts . . . have engaged in [a thorough] analysis" of "the precise contours of the term 'willful' as used in Section 5321": *Williams II*, *United States v. Bohanec*, No. 15-4347, 2016 WL 7167860 (C.D. Cal. Dec. 8, 2016),

and *United States v. McBride*, 908 F. Supp. 2d 1186 (D. Utah 2012), and that "*Williams*, *Bohanec*,

and *McBride* all stand for the proposition that a defendant has willfully violated Section 5321 not

only when he knowingly violates the rule but also when he recklessly does so" (citations omitted)).

The *Bedrosian* Court noted:

> Those holdings are grounded on the Supreme Court's decision in *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007), where the Court discussed how to determine civil liability for "willfully fail[ing] to comply" with the Fair Credit Reporting Act ("FCRA"). The Court there began by characterizing "willfully" as a "word of many meanings whose construction is often dependent on the context in which it appears." Importantly, it then stated that, "where willfulness is a statutory condition of civil liability, [the Court has] generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Id.* [at 57] (collecting cases in which the Court so defined the term in the context of civil statutes). Consistent with that trend, the Court concluded that the FCRA's requisite willful intent was satisfied by a finding that the defendant recklessly violated the statute.

2017 WL 1361535, at *4 (citations to *Safeco*, 551 U.S. at 57–58 omitted).

The Fourth Circuit concluded that Williams's failure to file an FBAR was willful,

reasoning:

> Williams signed his 2000 federal tax return, thereby declaring under penalty of perjury that he had "examined this return and accompanying schedules and statements" and that, to the best of his knowledge, the return was "true, accurate, and complete." "A taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents." *Greer v. Commissioner of Internal Revenue*, 595 F.3d 338, 347 n. 4 (6th Cir.2010); *United States v. Doherty*, 233 F.3d 1275, 1282 n. 10 (11th Cir.2000) (same). Williams's signature is prima facie evidence that he knew the contents of the return, *United States v. Mohney*, 949 F.2d 1397, 1407 (6th Cir.1991), and at a minimum line 7a's directions to "[s]ee instructions for exceptions and filing requirements for Form TD F 90–22.1" put Williams on inquiry notice of the FBAR requirement.

*Williams II*, 489 Fed App'x at 659.

Certainly, there also was Williams's testimony that he did not read the directions, and his

response to his tax preparer's question about overseas accounts bolstered the evidence of "conduct

that was 'meant to conceal or mislead sources of income or other financial information.'" *Id.*

(quoting *Sturman*, 951 F.2d at 1476).  Additionally, his "guilty plea allocution further confirm[ed] that his violation of § 5314 was willful."  *Id*. at 660.  But, the Fourth Circuit did not state that all of the evidence before it was necessary to reach the conclusion it did.  *See id.* at 659–60 (concluding that Williams's "conduct constitute[d] willful blindness" before noting that his "guilty plea allocution *further* confirm[ed]" the willfulness of his violation (emphasis added)).  The Fourth Circuit stated that Williams's "conduct constitute[d] willful blindness to the FBAR requirement," which it stated was "equally culpable under the law" to "actual knowledge." *Id.* (quoting *Poole*, 640 F.3d at 122).  It concluded that, "at a minimum, Williams's undisputed actions establish reckless conduct, which satisfies the proof requirement under § 5314."  *Id.* at 660.

Here, it is undisputed that the Horowitzes signed their 2007 and 2008 tax returns.  Thus, like Williams, by signing they "declar[ed] under penalty of perjury that [they] had 'examined this return and accompanying schedules and statements' and that, to the best of [their] knowledge, the return was 'true, accurate, and complete.'"  *See Williams II*, 489 Fed App'x at 659.  It also is undisputed that the tax returns included a question of whether they had foreign accounts, followed by a cross-reference to "exceptions and filing requirements for Form TD F 90-22.1 [FBAR]." Because "[a] taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents, [their] signature[s] [are] prima facie evidence that [they] knew the contents of the return," including the foreign accounts question and the cross-reference to "filing requirements, which put them "on inquiry notice of the FBAR requirement." *See Williams II*, 489 Fed App'x at 659 (quoting *Greer*, 595 F.3d at 347 n.4).

The Horowitzes argue that their friends told them they did not need to pay taxes on the interest in their foreign accounts. Maybe so, but their friends' credentials are not before the Court,

nor is there any information from which I could assess whether it was reasonable for them to have accepted what their friends told them as legally correct. And, in any event, their friends' views would not override the clear instructions on Schedule B, which, as noted, requires a "Yes" answer if the taxpayer has an interest in a foreign account, regardless of whether the funds within it constituted taxable income. Moreover, the fact that the Horowitzes discussed their tax liabilities for their foreign accounts with their friends demonstrates their awareness that the income could be taxable. Their failure to have the same conversation with the accountants they entrusted with their taxes for years, notwithstanding the requirement that taxpayers with foreign accounts complete Part III of Schedule B, easily shows "a conscious effort to avoid learning about reporting requirements." *Williams II*, 489 Fed. App'x at 658 (quoting *Sturman,* 951 F.2d at 1476). On these facts, willful blindness may be inferred. *See Poole,* 640 F.3d at 122 ("[I]n a criminal tax prosecution, when the evidence supports an inference that a defendant was subjectively aware of a high probability of the existence of a tax liability, and purposefully avoided learning the facts pointing to such liability, the trier of fact may find that the defendant exhibited 'willful blindness' satisfying the scienter requirement of knowledge." (quoted in *Williams II* in the context of civil liability)). Thus, even without the additional evidence that was present in *Williams II*, I find based on these undisputed facts that the Horowitzes recklessly disregarded the FBAR filing requirement. *See Williams II*, 489 Fed App'x at 659. This suffices for a finding of willfulness. *See id.*; *Safeco,* 551 U.S. at 57.

## Conclusion

In sum, Susan Horowitz's Motion for Partial Summary Judgment, ECF No. 67, IS GRANTED; the Government's Motion for Summary Judgment, ECF No. 66, IS GRANTED as to the 2007 penalties assessed against Peter and Susan and the 2008 penalties against Peter but

DENIED as to the 2008 penalties against Susan; and Defendants' Motion for Summary Judgment,

ECF No. 68, IS DENIED.  A separate order will issue.


Date: January 18, 2019                                          _____/S/_____
                                                               Paul W. Grimm
                                                               United States District Judge